

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

MRM:BTK
F. #2018R01102

*610 Federal Plaza*
*Central Islip, New York 11722*

October 2, 2023

By ECF and E-mail
The Honorable Arlene R. Lindsay
United States Magistrate Judge
United States District Court
Eastern District of New York
Central Islip, New York 11722

    Re: United States v. Qin Hui,
       also known as "Hui Qin," "Hui Quin,"
       "Muk Lam Li" and "Karl,"
       <u>Docket No. 23-MJ-865 (JMW)</u>

Dear Judge Lindsay:

    The government respectfully submits this letter in anticipation of the defendant's initial appearance on the above-captioned Complaint, which charges him with the Production of a False Identification Document, in violation of Title 18, United States Code, Section 1028(a)(1) (the "Complaint"). As explained below, the Court should find that the defendant is a danger to the community and risk of flight and enter a Permanent Order of Detention against him.

BACKGROUND[1]

I.  <u>The Defendant's Alias and Production of a False Florida Driver's License</u>

    As described in the Complaint, the defendant is a citizen of the People's Republic of China ("PRC"). In 2018, Forbes Magazine placed the defendant on a list of billionaires and estimated that his net worth was $1.8 billion. See https://www.forbes.com/profile/qin-hui/?sh=1e4b19c77138.[2] In or about October 2019, the United States Department of State

---

[1] Because the "rules concerning admissibility of evidence in criminal trials do not apply" to bail hearings, see 18 U.S.C. § 3142(f)(2)(B), the parties may proceed by way of proffer. See United States v. LaFontaine, 210 F.3d 125, 130-31 (2d Cir. 2000). This proffer of facts is not a complete statement of all facts and evidence of which the government is aware or that it will seek to introduce at trial.

[2] Forbes removed the defendant from this list in 2019.

granted the defendant Lawful Permanent Resident ("LPR") status based upon applications that the defendant and his ex-wife ("Jane Doe 1") filed in or about and between March 2018 and April 2019 (the "LPR applications").  As relevant here, the LPR applications collectively stated that the defendant had not been known by "other names," including an "alias."  As the defendant's voluntary interviews with Federal Bureau of Investigation ("FBI") Special Agents revealed, however, this was a lie.

Between January 30, 2019 and April 30, 2019, the defendant voluntarily met with FBI Special Agents for a series of interviews (the "FBI interviews") to discuss a variety of matters, including his having obtained identification documents bearing the alias "Muk Lam Li" (the "Li alias").[3]  The agents' questions concerning the Li alias were prompted by a border search that was conducted at the John F. Kennedy International Airport in Queens, New York ("JFK") on or about June 8, 2018 (the "border search").  During the border search, the defendant, who was returning from Hong Kong to New York, was found in possession of a Hong Kong identification card, bearing his photograph and the Li alias.

After falsely telling the FBI agents that he had not been known by any other names "since 1995," the defendant admitted, in substance, that, around 2008, he purchased the Li alias from a PRC government official for around 100,000 of an unknown currency.  The defendant further stated that he knew that his possession and use of the Li alias was "illegal" in the PRC, but that he had used the Li alias and related identification documents to travel from the PRC to Hong Kong, Europe and Taiwan.  The defendant further stated that he had acquired a variety of forms of identification in the Li alias, including a PRC identification card for the Guangdong Province, credit cards, a Hong Kong passport and the aforementioned Hong Kong identification card.  In addition, the defendant stated, in substance, that between approximately September 2017 and November 2017, he used the Li alias to wire transfer approximately $5 million to Jane Doe 1 from bank accounts based in Hong Kong to bank accounts based in the United States.[4]

After extensively discussing his use of false identification documents with the FBI, the defendant elected to fraudulently obtain a Florida Driver's License from the Florida Department of Highway Safety and Motor Vehicles ("FLHSMV").  Specifically, on or about December 20, 2020, the defendant took an interstate flight from LaGuardia Airport in Queens, New York to Miami, Florida.[5]  Once there, he went to an FLHSMV office and signed an application "under penalty of perjury," stating that "the information" that he provided to

---

[3] During these interviews, which were video-recorded, a FBI linguist translated from English to Mandarin and Mandarin to English.

[4] Jane Doe 1's identity is known to the United States Attorney.

[5] Subpoenaed flight records show that the defendant travelled to Miami on December 20, 2020 with Jane Doe 1, his ex-wife, with whom he has resided at the Residence and at a Manhattan apartment.

FLHSMV in connection with his Florida Driver's License application was "true and correct." That was a lie.

      In fact, the defendant falsely informed FLHSMV that he resided at an address in Miami, Florida, that is known to the government (the "Miami address"). But, in truth, the defendant was a resident of Old Westbury, New York and New York, New York and he never resided at the Miami address. To further defraud the FLHSMV, the defendant proffered false documents that purported to be statements from Bank of America and Macy's, Inc. (the "defendant's proffered documents"). The defendant's proffered documents falsely set forth the Miami address and bore the name "Hui Quin." The defendant's scheme worked and on or about December 21, 2020, the FLHSMV issued the defendant a Florida Driver's License bearing the defendant's photograph, the name "Hui Qin" and the false Miami address (the "fraudulently-obtained Florida Driver's License").

      Once he secured the fraudulently-obtained Florida Driver's License, the defendant used it in a variety of ways. On or about June 23, 2022, the defendant provided the fraudulently-obtained Florida Driver's License to the New York State Department of Motor Vehicles ("DMV") to secure a New York State Driver's License from the DMV. In DMV application, the defendant provided his address in Old Westbury, New York (the "Residence"), where he has resided with Jane Doe 1, even after their divorce. In addition, in or about and between April 2021 and June 2021, the defendant provided the fraudulently-obtained Florida Driver's License as identification to JP Morgan Chase Bank ("Chase") and Cathay Bank ("Cathay") in connection with accounts that the defendant maintained at Chase (the "defendant's Chase account") and at Cathay. And in February 2022, the defendant provided the fraudulently-obtained Florida Driver's License to the Bullen Insurance Company in connection with the defendant seeking a motor vehicle insurance policy.

      Thereafter, in or about and between April 2021 and May 2021, the defendant's Chase account received approximately $440,000 in wire transfers from a bank account held in the name of the Li alias, which were accompanied by wire transfer memoranda, including a memorandum that one of the wire transfers was a "Loan to Beneficiary." That brought to at least $5.4 million the amount of funds that the defendant had wired in the name of the Li alias between 2017 and 2021.

II.    <u>The Defendant's Travel Using the Li Alias</u>

      Documents obtained pursuant to a Mutual Legal Assistance Treaty ("MLAT") request from a private aircraft operator, the identity of which is known to the United States Attorney ("John Doe Company"), and other travel records, showed that, in or about and between December 2017 and December 2018, the defendant used the Li alias when travelling from Republic Airport in Farmingdale, New York to Finland and from JFK to China. A June 4, 2016 email between John Doe Company personnel confirmed that the defendant used the Li alias to travel on private aircraft. Specifically, the email stated:

      There are two things that should be clear for everyone. One is the confidentiality about the owner but this is not different from any other aircraft. We're talking about external communication with handlings, CAA, service

3

> providers… You never mention to them, Mr X, Y, Z = the Owner. For internal communication between the PAs, the OCC and [John Doe Company,] however, there is not much secret. So if we say, Mr Qin is on board, I don't see where's the problem.
>
> What is more particular to this client is that he's using a different name and passport when flying to/from China. Internally, PAs, OCC and [John Doe Company], we all know about it but of course it can't be told to third parties. We just tell Li Muk Lam will be on the passenger list and that's it.

"CAA," refers to civilian aviation authorities, which are government authorities, such as the Department of Homeland Security's Customs and Border Protection ("CBP") and the Federal Aviation Administration ("FAA"), that oversee the regulation of private aircraft entering the United States. As such, the above email confirms that the defendant was travelling to and from the PRC on private aircraft using the Li alias and without disclosing his true identity to third-parties, including civilian aviation authorities, such as CBP and FAA.

III.    The Defendant's Recent Arrest and Strangulation of Jane Doe 1

On September 22, 2023, the Village of Old Westbury Police Department ("OWPD") received a 911 call, stating, in substance, that the defendant used an ax to break the door to Jane Doe 1's bedroom closet at the Residence, which was secured with an electronic lock. At the time of the defendant's ax-wielding conduct, his minor son and ex-mother-in-law, whose identity is known to the United States Attorney ("Jane Doe 2") were present at the Residence. In response to the 911 call, OWPD Officers went to the Residence, where the below photographs, depicting damage to Jane Doe 1's bedroom closet and an ax were taken:







Accordingly, on September 22, 2023, OWPD officers arrested the defendant. The defendant was charged with Criminal Mischief, in violation of New York State Penal Law 145.00. See Nassau County Dkt. No. CR-18720-23/NA (the "Criminal Mischief Case"). A Nassau County District Court Judge released the defendant on his own recognizance and issued a Do Not Harass Order, prohibiting the defendant from harassing Jane Doe 1. The defendant is scheduled to return to Court in the Criminal Mischief Case on October 10, 2023.

This was not the first time that the defendant engaged in violence directed at Jane Doe 1. Indeed, photographs and a text message conversation between Jane Doe 1 and an individual whose identity is known to the United States Attorney, showed that on or about July 25, 2022, the defendant strangled Jane Doe 1 during an argument. Jane Doe 1 took photographs to document the defendant's strangulation of her, which are set forth below:[6]

---

[6] The facts set forth in this letter concerning the defendant's strangulation of Jane Doe 1, his use of Li alias, the fraudulently-obtained Florida Driver's License and the defendant's use of

 

## IV. The Southern District of New York's August 2023 Contempt Order

In addition to the present case and the Criminal Mischief Case, the defendant is also a respondent in Huzhou Chuangtai Rongyuan Inv. Mgmt. P'ship, et al. v. Qin, 21-CV-9221 (S.D.N.Y.) (KPF) (the "civil proceeding"), an action to enforce a $450 million foreign arbitration award that was issued against the defendant, which is currently pending before the Honorable Katherine Polk Failla.  As relevant here, the petitioners in the civil proceeding allege that the defendant "transferred ownership of his home in Old Westbury, New York [the Residence], to his ex-mother-in-law [Jane Doe 2] and ex-wife [Jane Doe 1] for only ten dollars in a series of transactions occurring shortly after the underlying arbitration was commenced in China.  The timing of the transactions, as well as the minimal consideration offered for the home, suggest that the transfer was not made for genuine business purposes."  See Oct. 28, 2022 Order, 21-CV-9221 (S.D.N.Y.) (ECF No. 61 at 2).  Jane Doe 1 is currently scheduled to be deposed by the petitioners on or before October 5, 2023.  See id. at ECF No. 215.

On August 24, 2023, Judge Failla issued a Civil Contempt Order against the defendant, finding that he "violated each and every one of this Court's discovery orders," beginning on November 1, 2022.  See Aug. 24, 2023 Order, ECF No. 243, at 1.  The Court

---

the Li alias to travel aboard private aircraft and to send more than $5 million in wire transfers from Hong Kong to the United States, as well as other facts related to the government's years-long investigation into the defendant's fraudulent conduct, were not presented to the Nassau County District Court.

further concluded that "there is strong evidence that [the defendant's] noncompliance has been willful and that he has engaged in the spoliation of evidence." Id.  Specifically, the Court recounted the defendant's refusal to provide passwords to open his cellular telephones, which the Court ordered that he surrender for forensic imaging and noted that the defendant had "repeatedly screamed" at the petitioner's counsel and a forensic imaging expert. Id. at 2.  After the defendant's statement that he "'would rather be detained than provide [the] Petitioners with the information on his phones,'" the Court "sanctioned [the defendant] to arrest and confinement," staying its Order to allow the defendant provide the petitioner's and the forensic expert with his passwords.[7]

V.      The Defendant's Planned Foreign Travel

Review of a database available to law enforcement showed that on or about September 25, 2023—about three days after his arrest and appearance in the Criminal Mischief Case—the defendant was scheduled to leave the United States from JFK—via a one-way ticket—on a flight to Frankfurt, Germany.  Ultimately, the defendant did not board that flight and was arrested by FBI agents today at the Manhattan apartment that he shares with Jane Doe 1.

ARGUMENT

I.      Legal Standard for Detention

Under the Bail Reform Act, 18 U.S.C. § 3141 et seq., federal courts are empowered to order a defendant's detention pending trial upon a determination that the defendant is either a danger to the community or a risk of flight.  See 18 U.S.C. § 3142(e)

The Bail Reform Act lists four factors to be considered in the detention analysis, whether for risk of flight or dangerousness: (1) the nature and circumstances of the crimes charged; (2) the history and characteristics of the defendant; (3) the seriousness of the danger posed by the defendant's release; and (4) the evidence of the defendant's guilt.  See 18 U.S.C. § 3142(g); see also United States v. Jacobson, 502 F. App'x 31, 32 (2d Cir. 2012).

The government must support a finding of dangerousness by clear and convincing evidence, see United States v. Ferranti, 66 F.3d 540, 542 (2d Cir. 1995), and a finding of risk of flight by a preponderance of the evidence, see United States v. Jackson, 823 F.2d 4, 5 (2d Cir. 1987); see also United States v. Abuhamra, 389 F.3d 309, 320 n.7 (2d Cir. 2004).

II.     The Defendant Should Be Detained Pending Trial

A.      The Defendant is a Danger to the Community

Here, the evidence of the defendants' guilt is overwhelming.  Flight records and the defendant's falsely sworn statement, which contains his photograph, signature, his false Miami address and his fake proffered bank and credit card statements, amply demonstrate that

---

[7] The defendant has moved for reconsideration of Judge Failla's Contempt Order, which the petitioners have opposed.  See Dkt. No. 21-CV-9221 (S.D.N.Y.), ECF No. 274.

the defendant took an interstate flight to from New York to Miami to defraud the FLHSMV and obtain the fraudulently-obtained Florida Driver's License. That the defendant would even attempt to brazenly dupe a State government entity after repeated questioning from the FBI about his admittedly illegal use of an alias for more than a decade only further cements the avalanche of proof against this defendant, who has shown a total disregard for this nation's laws and justice system.

The defendant's danger to the community is manifestly clear because the defendant has already threatened a prospective witness with an ax and strangled her. Indeed, on or about July 25, 2022, the defendant strangled his ex-wife, Jane Doe 1, with whom he resides. Then, on September 22, 2023, the defendant was charged with Criminal Mischief for using an ax to hack at his Jane Doe 1's electronically-locked bedroom closet door. The defendant engaged in this obviously intimidating conduct in the presence of his and Jane Doe 1's son and Jane Doe 1's mother. By that point, the defendant knew that Jane Doe 1 had been ordered to testify in the civil proceeding, where he is alleged to have engaged in a sham transfer of the Residence to Jane Doe 1 and Jane Doe 2 to defraud his creditors to whom he is alleged to owe around $450 million. Significantly, Jane Doe 1's deposition was scheduled to occur within approximately two weeks of the defendant's ax attack and bore the obvious specter of the defendant's violent attempt to corruptly influence Jane Doe 1's testimony in the civil proceeding, an inference that is equally obvious from the defendant's strangulation of Jane Doe 1.

With regard to the present case, travel records show that Jane Doe 1 travelled with the defendant to Florida when he secured the fraudulently-obtained Florida Driver's License and that Jane Doe 1 filed a LPR application that did not disclose the defendant's longstanding use of the Li alias, which the defendant used to wire-transfer around $5 million to Jane Doe 1 before the LPR application was filed. As such, Jane Doe 1 is a witness to the defendant's fraud in the present case and the defendant's ax-attack and strangulation of her shows that he would undoubtedly seek to violently intimidate Jane Doe 1 were he released. As such, the Court should enter a Permanent Order of Detention against the defendant. United States v. Gotti, 794 F.2d 773, 779 (2d Cir. 1986) (noting that the Second Circuit has "unanimously reaffirmed the long-standing principle that pretrial detention" is proper "when it is imposed to prevent a defendant from intimidating witnesses"); LaFontaine, 210 F.3d at 134 ("[O]bstruction of justice has been a traditional ground for pretrial detention by the courts"); United States v. Millan, 4 F.3d 1038, 1046 (2d Cir. 1993) (witness intimidation is the type of activity that supports a finding of danger to the community); United States v. Grisanti, 1992 WL 265932, at *6–7 (S.D.N.Y. 1992) (witness intimidation supports a conclusion that defendant cannot be trusted to comply with the court's directions).

In addition to his arrest for his recent ax-wielding onslaught, Judge Failla has already sanctioned the defendant with imprisonment for repeatedly and blatantly violating the Southern District Court's basic discovery orders and accentuating his contemptuous conduct by engaging in erratic behavior, including " repeatedly scream[ing]" at attorneys and a forensic expert and refusing Court discovery directives by stating that he would rather be imprisoned than comply. Against this backdrop, where the defendant still resides with Jane Doe 1, the Court

should find that he poses a danger to Jane Doe 1 in the form of continued violence, intimidation and harassment and order his detention pending trial.[8]  See, e.g., Gotti, 794 F.2d at 779.

And the potential danger here extends beyond the defendant's demonstrated intimidation of a witness.  Indeed, after securing the fraudulently-obtained Florida Driver's License, the defendant proffered it to banks and insurance company knowing full well that his possession of it was based on his lies and deceit, which the defendant has been engaged in for more than a decade.  During that time, the defendant: secured an illegal alias and related identifying documents in the PRC and Hong Kong, used that alias to travel internationally and wire-transfer millions of dollars to Jane Doe 1 in the United States and then obtained LPR status under false pretenses based upon applications that did not disclose his use of the alias to the Department of State.  This unbroken pattern of fraud shows that the defendant would only continue to defraud the government and other members of the community were he released.  Cf. United States v. Patel, 2020 WL 1698785, at *3 (D.N.J. Apr. 8, 2020); United States v. Madoff, 586 F. Supp. 2d 240, 253 (S.D.N.Y. 2009).  This alone warrants his detention pending trial.

B.    The Defendant Is A Flight Risk

As noted above, the weight of the evidence against the defendant is overwhelming.  After more than a decade of using an illegal alias to travel, engage in multi-million-dollar banking transactions and acquiring LPR status under false pretenses, the defendant admitted his use of an alias to the FBI and then set about getting another fake form of identification in the United States that he proffered to banks, an insurance company and the New York State DMV.  Where, as here, the evidence of guilt is strong it provides "a considerable additional incentive to flee."  United States v. Millan, 4 F.3d at 1046; see also United States v. Palmer-Contreras, 835 F.2d 15, 18 (1st Cir. 1987) (per curiam) (where "the evidence against defendants is strong, the incentive for relocation is increased").

Moreover, the defendant has established financial accounts in the name of the Li alias, some of which are located the PRC and the contents of which are beyond the reach of the government.  Given the defendant's strong ties to PRC, his use of the Li alias to travel surreptitiously and his likely access to vast sums of wealth, there is every reason to believe that the defendant will flee if he were released.  See United States v. Choudhry, 941 F. Supp. 2d 347, 357 (E.D.N.Y. 2013) (denying bail and finding defendant a flight risk in case where defendant was charged with visa fraud and other crimes because the defendant's "local ties are counterbalanced by Defendant's equally strong ties to Pakistan."); United States v. Solano–Fell, 2009 WL 66071, at *2 (W.D.N.Y. 2009) (defendant's foreign citizenship, family ties to other countries, and visits to those jurisdictions suggested "a significant risk of flight"); United States v. Pryce, 2005 WL 464945, at *4 (W.D.N.Y. 2005) (foreign citizen with extensive ties to home country was a flight risk); United States v. Sabhnani, 493 F.3d 63, 76 (2d Cir. 2007) (ordering detention based upon access to overseas wealth); United States v. Londono-Villa, 898 F.2d 328,

---

[8]    Should the Court even consider releasing the defendant—and it should not—the Court should order him confined to a residence other than any residence shared with Jane Doe 1, secure him with electronic monitoring and order that the defendant have no further contact with Jane Doe 1, other than through an approved intermediary for properly supervised child-care.

329 (2d Cir. 1990) (reversing release on bail based on flight risk where bail proposed amounted to much less than the money potentially involved in the crime); United States v. Amico, 2006 U.S. Dist. LEXIS 60996 (W.D.N.Y. 2006) (defendant found to be a flight risk where large amounts of money went unaccounted for in fraud scheme); United States v. Lugo-Rios, 2006 U.S. Dist. LEXIS 49657 (D.P.R. 2006) (defendant found to be a flight risk where the amount of money stolen from health care fraud scheme could not be determined).  Accordingly, based upon the tremendous risk of flight present here, the Court should issue a Permanent Order of Detention against the defendant.

Furthermore, the significant term of imprisonment that the defendant faces creates a substantial incentive to flee.  Here, the defendant—who has never previously been imprisoned— faces up to fifteen years imprisonment and a Guidelines sentence of 10-16 months' imprisonment.  See 18 U.S.C. § 1028(b)(1)(A)(ii).  Obviously, the possibility of a substantial prison term, especially for an individual who likely has access to vast sums of wealth and has never been imprisoned creates a "potent" incentive to flee.  See United States v. Jackson, 823 F.2d 4, 7 (2d Cir. 1987); United States v. Martir, 782 F.2d 1141, 1147 (2d Cir. 1986); United States v. Cisneros, 328 F.3d 610, 618 (10th Cir. 2003) (defendant was a flight risk because her knowledge of the seriousness of the charges against her gave her a strong incentive to abscond).  That prospect is all the more manifest here because about three days after being charged in the Criminal Mischief case, and released on his own recognizance, the defendant booked a one-way flight to Germany, despite having an October 10, 2023 court date in the Nassau County District Court.  Although the defendant did not board that flight, there is no doubt that he would do so now, facing yet another criminal charge.

Finally, the defendant's actions in the civil proceeding show that he has demonstrated an inability to comply with basic court orders.  Indeed, that the defendant violated each of a federal court's discovery orders in arbitration case renders obvious the conclusion that he will be wholly unable to conform to the substantial liberty restrictions that should accompany any possible release order here, including home confinement, electronic monitoring, no-contact with Jane Doe 1 and other means deemed necessary by Pre-Trial Services.  This, too, shows that the Court should issue a Permanent Order of Detention.

<u>CONCLUSION</u>

For the reasons set forth above, the defendant should be remanded pending trial.

Respectfully submitted,

BREON PEACE
United States Attorney

By:    <u>/s/Bradley T. King</u>
       Bradley T. King
       Assistant U.S. Attorney
       (631) 715-7900

cc:    Defense Counsel (by ECF and E-mail)
       United States Department of Pretrial Services