UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x
UNITED STATES OF AMERICA,


       – against –                                    No. 24-cr-100 (JMA)


QIN HUI,

                    Defendant.

------------------------------------------------------------------------x


---

## SENTENCING MEMORANDUM OF DEFENDANT QIN HUI

---


**MEISTER SEELIG & FEIN PLLC**
***Attorneys for Qin Hui***
125 Park Avenue, 7th Floor
New York, New York 10017
Phone: (212) 655-3500
Fax: (212) 655-3535

## <u>TABLE OF CONTENTS</u>

I.    INTRODUCTION ................................................................................................ 1

II.   MR. QIN'S PERSONAL HISTORY AND CHARACTERISTICS WARRANT A TIME
      SERVED SENTENCE ...................................................................................... 2

      A.    Mr. Qin Experienced a Tumultuous Childhood During China's Cultural Revolution
            ........................................................................................................................ 4

      B.    Mr. Qin Suffered a Tragedy in His Young Adult Life When His Wife Suddenly
            Died from a Brain Aneurysm ...................................................................... 5

      C.    After His Personal Life Collapsed, Mr. Qin Poured Himself into Business and He
            Built a Media Empire ................................................................................... 6

      D.    In 2010, Mr. Qin Remarried and Had Two More Children ................................... 7

      E.    Mr. Qin's Growing Fame and Fortune Created Concerns for His Safety in China 8

      F.    The Global Pandemic and China's "Zero-Covid Policy" Destroyed Mr. Qin's
            Media Company and Caused Him Enormous Personal Financial Distress ..........10

      G.    Upon Mounting Personal Debts, Ms. Liu Seeks a Divorce in China and the Family
            is Divided ....................................................................................................10

      H.    At the Time of Mr. Qin's Arrest, He Was Separated from His Ex-Wife, in
            Substantial Personal Debt, and Facing Multiple Lawsuits ....................................12

III.  A FURTHER CUSTODIAL SENTENCE IS UNNECESSARY TO ACHIEVE THE
      TWIN AIMS OF FEDERAL SENTENCING: GENERAL AND SPECIFIC
      DETERRENCE.............................................................................................. 13

      A.    A Time-Served Sentence Will Achieve General Deterrence and Respect for the
            Law ............................................................................................................ 14

      B.    Detention at MDC Brooklyn Provided a Particularly Severe Seven-Month Period
            of Incarceration to Specifically Deter Mr. Qin in the Future................................ 16

IV.   OFFENSE CONDUCT, THE PSR, AND THE SENTENCING GUIDELINES ............. 19

V.    CONCLUSION ............................................................................................... 23

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*United States v. Adelson*,
  441 F. Supp. 2d 506 (S.D.N.Y. 2006) .................................................................... 2

*United States v. Ahmad*,
  202 F.3d 588 (2d Cir. 2000) ................................................................................ 20

*United States v. Chavez*,
  No. 22 Cr. 303 (JMF), 2024 WL 50233 (S.D.N.Y 2024)..................................... 14, 15

*United States v. Days*,
  No. 19 Cr. 619 (CM) (S.D.N.Y. Apr. 29, 2021)........................................................ 14

*United States v. Gupta*,
  904 F. Supp. 2d 349 (S.D.N.Y. 2012) .................................................................... 2

*United States v. Ilayayev*,
  800 F. Supp. 2d 417 (E.D.N.Y. 2011) .................................................................... 13

*United States v. Lenoci*,
  377 F.3d 246 (2d Cir. 2004) ............................................................................ 19, 20

*United States v. Napoli*,
  179 F.3d 1 (2d Cir. 1999) .................................................................................... 19

*United States v. Schulman*,
  No. 16 Cr. 442 (JMA) (E.D.N.Y. Oct. 6, 2017) ...................................................... 13

*United States v. Speed Joyeros, S.A.*,
  204 F. Supp. 2d 412 (E.D.N.Y. 2002) .................................................................... 13

*United States v. Velazquez*,
  No. 16 Cr. 233 (AKH), 2017 WL 2782037 (S.D.N.Y., May 26, 2017)............................ 12, 13

*United States v. Watt*,
  707 F.Supp.2d 149 (D. Mass. 2010)........................................................................ 13

*United States v. Young*,
  No. 23 Cr. 475 (DLI) (E.D.N.Y., Dec. 15, 2023)..................................................... 12, 13

**Statutes**

18 U.S.C. §1028(b)(2)(A) ................................................................................. 17

18 U.S.C. § 1546 ............................................................................................. 17

18 U.S.C. § 3553 ....................................................................... 1, 2, 11, 12, 13

28 U.S.C. § 994(j) ............................................................................................ 13

52 U.S.C. § 30122 ........................................................................................... 17

52 U.S.C. § 30109(d)(1)(D)(i) ......................................................................... 17

**Rules**

U.S.S.G. § 3D1.2 ....................................................................... 17, 18, 19, 20

U.S.S.G. § 4C1.1(a) ......................................................................................... 18

## EXHIBIT LIST

| Exhibit A |
|---|
| Letter of Support from Jifa Qu |
| Exhibit B |
| Letter of Support from Maodong Xu |
| Exhibit C |
| Letter from Neurologist |
| Exhibit D |
| Nassau County District Court Short Form Order for Reduction |

Defendant Hui Qin respectfully submits this sentencing memorandum in support of his request for a time-served sentence, which would be sufficient but not greater than necessary to achieve the goals of the federal sentencing statute.

## I.

## INTRODUCTION

The federal sentencing statute provides that "[t]he court shall impose a sentence sufficient, but not greater than necessary" to satisfy the statutory goals of sentencing. 18 U.S.C. § 3553(a). Hui Qin[1] has devoted his life to two things:  his family and his career, as a media businessman. Now, both are in shambles.

Mr. Qin has pled guilty to the government's Information, charging him with three felony false statement offenses.  All three involve Mr. Qin providing or causing to provide false information on government disclosures.  Mr. Qin did not profit financially or gain any special government favors from these false statements, other than a "green card" in the United States, which he likely would have been eligible for even if he had not caused a false statement to be made in his petition.  These crimes were unnecessary to his life, and that makes his commission of them even more tragic.

The parties are in general agreement, pursuant to the terms of a plea agreement, that this Court should sentence Mr. Qin to time-served.  The Probation Office also agrees with this recommendation.  Mr. Qin already has served nearly seven months at the Metropolitan Detention Center ("MDC") in Brooklyn.  The conditions of his confinement have been severe and Mr. Qin has suffered real punishment.

---

[1] We refer to the defendant as Hui Qin in this memorandum.  He was charged as "Qin Hui."  In Chinese, the last name proceeds the first.  But because his surname is Qin, we properly refer to him as Mr. Qin.

Prior to 2020, Mr. Qin was living a charmed life, and a life well earned.  He was a Chinese entrepreneur, who started a movie theater business from scratch, and built it into a media empire.  In the years since the global pandemic, Mr. Qin has suffered the collapse of all that he built.  Due to China's near endless lockdown during the global pandemic, Mr. Qin's multiplex cinema business failed.  This sudden trauma to his business and financial status also led to a hostile divorce, and now the specter of being permanently separated from his United States citizen children, as a result of his offense conduct in this case.  Mr. Qin will be permanently banned from entering the United States upon his immediate removal after completing the sentence imposed by this Court.  His children, two young pre-teens (ages 11 and 13) from his last marriage, and one adult daughter from his first marriage, all live here.  It pains Mr. Qin that he will be unable to live near them, attend their graduations, weddings, and other major life events.  He will only be able to see them if they travel internationally to visit him.

These considerable consequences, which collaterally add to Mr. Qin's sentence, in combination with the nearly seven months he served in custody, at one of the harshest pretrial detention facilities in the country, represent substantial punishment for his false statement offense conduct.

Thus, we respectfully request this Court impose a sentence of time-served.

## II.

## MR. QIN'S PERSONAL HISTORY AND CHARACTERISTICS WARRANT A TIME-SERVED SENTENCE

Under the sentencing statute, the Guidelines are but one factor for the Court's consideration.  Wisely, under 18 U.S.C. § 3553(a), the first statutory factor that the Court is instructed to consider includes "the history and characteristics of the defendant." 18 U.S.C. § 3553(a)(1). "The Guidelines virtually ignore this measure of the man, but here as elsewhere the

2

Guidelines must take second place to section 3553(a), which requires a court to take account of a defendant's character in imposing sentence." *United States v. Gupta*, 904 F. Supp. 2d 349, 354 (S.D.N.Y. 2012).

Mr. Qin's life, his "personal history and characteristics," should feature prominently in the Court's consideration of a just sentence. The bare Sentencing Guidelines cannot capture Mr. Qin's devotion to his children, two of whom are only in middle school, and look to their father for guidance and support.  Mr. Qin's eldest daughter, Ruolin Qin (age 30), spoke almost daily with him until his arrest in this case.  Even then, she received his calls when he gained access to a prison phone.  However, now, she is devastated by the fact that her father will not attend her wedding in the United States.  Mr. Qin also hopes, upon release, to see his parents again, but their health and age make that desire more precarious by the day. *See* PSR, ¶ 54, at 11 (parents are aged 86 and 89).  Mr. Qin is also very close to his first wife's family, and supports her elderly parents after her unfortunate young death to a brain aneurysm. *Id.*, ¶ 59, at 11 (first wife died in 1996).  These realities of Mr. Qin's life render a time-served sentence (within or just below the advisory Guidelines),  sufficient but not greater than necessary punishment for Mr. Qin's offense conduct. *See, e.g., United States v. Adelson*, 441 F. Supp. 2d 506, 513-14 (S.D.N.Y. 2006) ("if ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance.").

### A. Mr. Qin Experienced a Tumultuous Childhood During China's Cultural Revolution

Mr. Qin came of age during China's Cultural Revolution, when the Communist Party consolidated power and eliminated its political opposition. This was a tumultuous and violent time in China's history, and it had similarly disruptive consequences to Mr. Qin's childhood. Mr. Qin's father served in the Chinese military. He thus was thrust in service during the Revolution. Due to a system of household registration in China, Mr Qin's took his young son from their family home in the Sichuan Province and brought him to Beijing, leaving Mr. Qin's mother and two siblings behind. *See* Ex. A, Ltr. of Jifa Qu (Mr. Qin's brother-in-law writes: "In early days, my in-laws worked and lived separately in Beijing and Sichuan (thousand miles away) due to Hukou, a system for household registration used in mainland China. So in his childhood before age six, he sometimes lived with his mother, and other times with his father, rarely lived with both parents.").

Mr. Qin had little contact with his mother and siblings while he was with his father in Beijing. He was no more than 6 years old. This had a lasting impact on Mr. Qin. Once in Beijing, Mr. Qin's father had to leave home for long stretches of military duties, and Mr. Qin was left alone in their temporary apartment there. He was only a young child, but remembers being cared for by strangers in the apartment building where they were housed during the most intense periods of civil unrest in the city.

Mr. Qin eventually reunited with his mother and siblings in Sichuan, but was scarred by his years of separation. He remembers being afraid to leave the house and became reclusive once he finally got back to his family home. During this time, life changed dramatically for his young family. They spent long stretches of time not going into town, or participating in any communal events. Mr. Qin's childhood was shaped by this period of social and material deprivation.

Eventually, Mr. Qin would return to Beijing.  He was admitted to University there.  His period of matriculation, however, was short-lived.  In his second year of studies, the student uprising in Tiananmen Square occurred.  University studies were halted and the students dispersed back to their family homes.  Mr. Qin never returned to complete his degree.

### B.   Mr. Qin Suffered a Tragedy in His Young Adult Life When His Wife Suddenly Died from a Brain Aneurysm

After the closing of Beijing People's University due to the student uprising in 1989, Mr. Qin left Beijing for a period of more than three years.  He studied finance on his own and worked for a State-owned trading company.  There, he taught himself accounting and finance principles, and learned how to read a financial statement and how to value a business.  He was in his early 20s, and wanted to be an entrepreneur.

He already was in a serious relationship with his longtime girlfriend, Jing Lin.  They first met in elementary school.  When Mr. Qin had to leave Beijing during the student democratic movement, he took Jing Lin with him to Guangzhou.  They married in 1992, and soon thereafter had a daughter together, Ruolin.  The young family moved to Beijing, where Mr. Qin started his first business, a local nightclub.

Tragedy, however, would strike Mr. Qin's young family only a few years later.  While still in her twenties, Mr. Qin's wife, Jing Lin, suffered a brain aneurysm and suddenly and tragically died. PSR, ¶ 59, at 12.  The shocking loss of his wife sent Mr. Qin into a tailspin.  He lost his closest friend and partner, and he was left alone with a toddler daughter.  He returned to his parents' home to grieve and get support to raise young Ruolin.  But his life was upended, his business was not profitable, and he did not want to lean on his parents for financial support.  He needed to start anew.

5

Mr. Qin decided he could not start a business career, and also be a stable, single parent for Ruolin.  He asked his sister to take Ruolin to the United States, where she could have a more comfortable childhood, gain a better education, and seek a better future than what she could expect as a girl in Chinese society at that time.

Mr. Qin felt very torn by this unpalatable decision.  He already lost his wife and now had to contemplate separation from his daughter.  He felt that he had little alternative but to allow his sister to take Ruolin to the United States.  He said goodbye to her and promised to stay in her life forever.  He made good on this promise up until the very day he was arrested in this case.

### C.      After His Personal Life Collapsed, Mr. Qin Poured Himself into Business and He Built a Media Empire

After losing his wife, and unwillingly separating from his young daughter, Mr. Qin poured himself into business.  He restarted the nightclub in Beijing, and it grew to become one of the largest and most popular entertainment spots in the entire city.

It was from this starting point, that Mr. Qin developed the company that became SMI Holdings Ltd.  SMI was a multi-media company that started in 2001 as a multiplex theater chain in China.  At its height, SMI operated over 3,000 movie theaters throughout China, and owned over 10,000 screens. PSR, ¶ 73, at 14.  Mr. Qin took the company public and added movie production, movie studios, and film and television programming to its business offerings.  Prior to the global pandemic, the company employed over 20,000 people.  It was one of the largest movie theater and production companies in China. *See* Ex. B, Ltr. of Maodong Xu ("Mr. Qin was once a successful entrepreneur and very well-known in mainland China.  He founded and operated SMI Cinemas, one of the largest movie theater operators in China.").  Mr. Qin was its founder and majority shareholder.

**D.      In 2010, Mr. Qin Remarried and Had Two More Children**

With his growing business success, Mr. Qin sought more personal happiness in his life. He had spent years grieving the loss of his first wife. After finding stability and success in his career, he was ready to seek a new partner, and found that person in Duo Liu. Ms. Liu was a Chinese citizen, who later became a naturalized U.S. citizen. Mr. Qin always thought about living in the United States, since he agreed to have his sister take his baby, Ruolin, to live there. Mr. Qin was still in constant communication with Ruolin throughout her childhood, and he looked forward to seeing her more often. So, when he became engaged to Ms. Liu, their intent was to start a family together in New York.

After their wedding, Ms. Liu took up residence there, and soon became pregnant. Their first child, a daughter, was born in 2011, and a boy quickly followed in 2013. Both children were born in the United States. Initially, Mr. Qin traveled to the United States on non-status visas for short stays, but he intended to move there upon obtaining residency through his wife. At this point in time, his business was large enough and operating on its own, that he no longer needed to be in China to manage it. Mr. Qin wanted finally to be able to spend time with family and enjoy the childhood years of his newest children, and reconnect with his first daughter, Ruolin, who was preparing to attend college at Northwestern University. *See* Ex. B, Ltr. of Maodong Xu ("[Mr. Qin] loves his children and takes great care of his family. He is very generous and kind to his friends, and is always willing to help others.").

When Mr. Qin moved his family to New York, he and Ms. Liu became very involved in public and community works. Mr. Qin used his fame and newfound wealth for many charitable purposes in his Long Island community. One friend from Long Island, Maodong Xu, writes the Court: "[Mr. Qin] has made generous contributions to the American communities. He donated

more than $1.5 million to Long Island schools and also made significant donations to the Cold Spring Harbor Laboratory." Ex. B, Ltr. of Maodong Xu.

Mr. Qin's brother-in-law, Jifa Qu, also noted that Mr. Qin "donated new playground equipment to Schwerin Early Childhood [School]" in Brooksville, New York. Ex. A, Ltr. of Jifa Qu.  Mr Qin also remembered the needy communities back in his homeland China.  Mr. Qu explained in his letter to the Court that Mr. Qin "donated more than $300,000 to [the] Red Cross for the Sichuan Earthquake [victims] in 2008." *Id.*  Mr. Qin always dedicated his charitable efforts to help children, and in his home province of Sichuan, "[h]e funded and built schools," throughout the province. *Id.*

These were Mr. Qin's best years, and he hoped to enjoy them with his family.

### E.    Mr. Qin's Growing Fame and Fortune Created Concerns for His Safety in China

By the mid-2000s, Mr. Qin had amassed a great deal of shareholder wealth and fortune from the SMI Cinemas business.  He became renowned in China as a young business mogul, who made a fortune on his own.  Sometimes, such success was dangerous in China.  The government regime frowned on capitalistic windfalls, and Mr. Qin was not viewed as a friend of the state.  He had married into a family (his first wife) that was politically exiled and condemned for their closeness with political opponents to the current regime in China.  Indeed, Mr. Qin's first wife's cousin's husband was a military leader, who had been convicted for sedition and imprisoned for life.

Given this political backdrop, Mr. Qin always tread carefully in China.  He tried to keep a low profile, but given his company's media status, that was always difficult to achieve.  He recognized, however, that his notoriety in mainland China was not always a positive for him and his family.  He was aware that entanglement with the government was always possible, even if all

8

his business dealings were legitimate and above-board.  This was a common sentiment among high-level businessmen in modern China.

It was in this context that Mr. Qin obtained a separate Hong Kong identification card under a different name.  He used this card to travel between China and Hong Kong, because it was difficult at that time for mainland China residents to travel frequently to the special province of Hong Kong.  He also wanted to have this travel card in case of emergency, which would enable him to leave China quickly.  Apparently, this apprehension was not uncommon among mainland China businessmen of notoriety and fortune.  As such, Mr. Qin was able to obtain the identity card in Hong Kong without difficulty.

Mr. Qin's initial purpose in obtaining this "alias" was to protect himself and his family in case that the government decided to turn against him and his company.  These concerns were only amplified after he married again and had more children.  He wanted to make sure that his children were safe and had promising futures.  It was for this reason that Ms. Liu moved to the United States.

When Mr. Qin began the process of obtaining his residency in the United States, he did not disclose his possession of the Hong Kong identity documents, which he knew would not help him in his application for U.S. residency.  So, regrettably, he kept this information from the U.S. immigration officers.  This was wrong, and he accepts responsibility for this decision.  It now causes him to be separated from his children again, all of whom live in the United States.

Mr. Qin obtained U.S. residency in June 2019, having not disclosed his alternative identity in Hong Kong documents.[2]

---

[2] Notably, Mr. Qin *never* used his Hong Kong identity documents to enter the United States. The PSR is wrong on this point at ¶ 13.

**F.      The Global Pandemic and China's "Zero-Covid Policy" Destroyed Mr. Qin's Media Company and Caused Him Enormous Personal Financial Distress**

All of Mr. Qin's self-created wealth and business empire came to a sudden and complete end due to the impact of Covid-19 in China.  For nearly three years, China's government employed a "zero-Covid policy," which included strict lockdowns throughout the country, night curfews, repeated quarantines, daily mass testing, and the eventual shuttering of retail stores and businesses. SMI Cinemas – a public movie theater company – did not survive.  The company defaulted on its debt holdings and the Chinese government provided no bailouts.   The company fell into insolvency.

Again, Mr. Qin's life fell into a tailspin. He left China and Hong Kong, where he faced potential persecution for the failure of his businesses, even though the business losses were a natural result of the pandemic, not of any misdeeds by Mr. Qin.  He felt threatened by the Chinese political regime and feared that he could be exploited as a scapegoat by politicians who sought unwarranted action to protect against the public backlash from the loss of jobs and shareholder price at SMI.

Mr. Qin moved more permanently to the United States at this time, living in Old Westbury, New York with his wife and two young children.  The family's distress continued to mount as creditors of SMI and other business entities began to file civil lawsuits in multiple international jurisdictions against Mr. Qin to collect on alleged personal guarantees attached to corporate debt.

**G.      Upon Mounting Personal Debts, Ms. Liu Seeks a Divorce in China and the Family is Divided**

Mr. Qin faced mounting lawsuits in Hong Kong by multiple investment funds and creditors to his businesses.  Unfortunately, Mr. Qin did not address these all in a timely way because he was not in Hong Kong at that time, and default judgments were entered, which he continues to try and undo.  Personal assets were seized in multiple jurisdictions, and creditors continue to try to enforce

10

judgments here in the United States for decisions issued by arbitration panels in Beijing, in which

Mr. Qin was given deficient process. *See* PSR, S.D.N.Y. Judgment, at 15.[3]

Ms. Liu decided this stress on the family was too much for her to bear, and sought a divorce

in China from Mr. Qin.  Not wanting to add to his personal distress, he agreed to the divorce, and

the couple continued to be estranged through her own legal troubles in 2022.

Mr. Qin still maintained close contact with his children, often staying in the family home

in Old Westbury, so he could see his children daily.  He tried to maintain cordial relations with

Ms. Liu, and tried to accommodate her active political life by attending public events with local

political figures.  While his financial life was collapsing, Mr. Qin tried to give the appearance that

he and Ms. Liu maintained their social status with friends, community leaders, and public officials.

This was the context of his engaging in the "straw donor" conduct, to which he pled guilty.  Mr.

Qin accepts responsibility for these actions, and admits the wrongfulness of the reports of these

contributions.  He acknowledges that during this time, he should have removed himself from

attending and participating in political events organized by his wife and other Chinese community

leaders in Queens and Long Island.  And certainly, he should not have allowed Chinese nationals

to use their funds to contribute to U.S. politicians through other citizens' names.

In an effort to maintain a sense of normalcy in his and Ms. Liu's public lives, he made

matters much worse for himself.  He has paid for this wrongdoing over the last seven months under

---

[3] To clarify Mr. Qin's current financial position, the three New York residences identified in the PSR, at p. 15, are all in Ms. Liu or her mother's name.  None of the residences are held in Mr. Qin's name.  Ms. Liu currently seeks a ruling from a New York matrimonial court giving her full control of these assets as part of the division of marital assets.

harsh conditions of pretrial confinement at the MDC Brooklyn.  He also faces permanent exile from his children in the United States through mandatory deportation from these offenses.[4]

### H.   At the Time of Mr. Qin's Arrest, He Was Separated from His Ex-Wife, in Substantial Personal Debt, and Facing Multiple Lawsuits

In October 2023, Mr. Qin was living alone in a Manhattan apartment he rented.  Ms. Liu and he were divorced.  She obtained a protective order keeping the two apart.[5]  He needed to schedule times to see his two minor children.  He faced multiple civil lawsuits in jurisdictions as far apart as New York and the British Virgin Islands.  His life was in its third tailspin.

After losing his first wife to a sudden and tragic death to a brain aneurysm, and losing his self-started business to a global pandemic, Mr. Qin was again alone and without a business or career.  He again faced real personal trauma.

It was at this time that he was arrested on a federal criminal complaint for producing (by giving false information on a Florida application) a false Florida driver's license in December

---

[4]  Also, Mr. Qin sought a Florida driver's license without having a Florida address. This again was an example of bad judgment after he moved to the United States.  The Florida driver's license was in Mr. Qin's true name, not in the "Li alias" name.  PSR, ¶ 15, at 7.  He simply did not have an actual address in Florida.  Mr. Qin wrongly chose convenience over truthfulness, and he regrets this decision as well.

[5]  In the PSR, the Probation Office identifies an open Nassau County case that Mr. Qin has charging Criminal Mischief, involving an incident in which Mr. Qin damaged property to a closet door. PSR, ¶ 51, at 10.  We note that the District Attorney's Office, after reviewing the evidence in that case, moved the Court to reduce the charge of Criminal Mischief in the 2nd Degree to the 4th Degree.  *See* Ex. D.  This reduction to a violation of New York P.L. 145.00[1], reduced the charge to a Class A misdemeanor from a felony.  This reduction reflects the fact that Mr. Qin had a reasonable right to the property he inflicted damage upon, *i.e,* the closet door in the family home in Old Westbury, which was where he was still residing with his ex-wife and children, and the fact that the damage done to the door was for a value of far less than $1,500.  Mr. Qin attempted to gain access to the contents of the closet, but no longer had the code to the lock.  This incident, however, resulted in a temporary order of protection, separating Mr. Qin from Ms. Liu.

2020.  He was immediately detained without bail at the MDC Brooklyn, where he has spent the last seven months prior to sentencing.

He has had sufficient time to reflect on his wrongdoing to which he pled guilty in this case. The punishment was swift and severe, given the conditions at the MDC explained in more detail below.  Mr. Qin is sorry for his actions in providing false information on multiple government applications and forms.  He knows the punishment will be more than simply the time he spends incarcerated.  The more lasting punishment is the permanent bar from returning to the United States, where all three of his children reside, including two who are only 11 and 13 years old.

Mr. Qin has experienced trauma now several times in his life.  The first few times he had no control of the tragedies that life dealt him:  his first wife's death at age 28, and then a global pandemic which wiped out a business empire that he started from scratch.  This third tragedy, *i.e.,* his permanent removal from the United States and separation from his three children who live here, he could have avoided.  He is the only one responsible for the false statements that he caused to be made on the three occasions charged here.

While there is no excuse for his conduct in this case, the personal history of Mr. Qin's past struggles with traumatic events, their potential impact on his judgment during the timeframe of the offense, and the collateral consequences of his conviction here, including the permanent separation from his children, are all crucial for understanding the "the nature and circumstances of the offense and the history and characteristics of the defendant," as required under 18 U.S.C. § 3553(a).

## III.

### A FURTHER CUSTODIAL SENTENCE IS UNNECESSARY TO ACHIEVE THE TWIN AIMS OF FEDERAL SENTENCING: GENERAL AND SPECIFIC DETERRENCE

While Mr. Qin's crimes are certainly serious, a further custodial sentence would not properly calibrate "just punishment" that is "sufficient but not greater than necessary" to "afford

adequate deterrence to criminal conduct," and "protect the public from further crimes of the defendant." 18 U.S.C. § 3553(a)(2)(C), (D).  As stated above, Mr. Qin accepts full responsibility for his crimes, and by all accounts he is tortured by his mistakes.  And, he has lost his right to live in this country with his children.  The fallout that Mr. Qin has already endured due to his criminal conduct is a cautionary tale, achieving deterrence without the need to impose a sentence beyond the seven months he already has served at MDC Brooklyn.

While we believe his advisory Guidelines range is 0-6 months, even if the Probation Office is correct at 8-14 months, Mr. Qin has served nearly all of the low end of that range.  For reasons we agree with, the Probation Office recommends a time-served sentence for this conduct pursuant to the 18 U.S.C. § 3553(a) factors. *See* PSR Recommendation, 4/8/2024.

Accordingly, the Court should sentence Mr. Qin to time-served.

**A.    A Time-Served Sentence Will Achieve General Deterrence and Respect for the Law**

In this case, nearly seven months of pretrial detention at the MDC Brooklyn is a meaningful and substantial sentence for the conduct charged in this case.

Courts in this Circuit have recognized that "every major survey of the evidence" has found that although "certainty of punishment has a deterrent effect, increases in severity of punishment do not yield significant (if any) marginal deterrent affects." *United States v. Velazquez*, No. 16-cr-233 (AKH), 2017 WL 2782037, at *4 (S.D.N.Y., May 26, 2017); *accord* U.S. Dep't of Justice, Nat'l Institute of Justice, *Five Things About Deterrence* (June 5, 2016), https://nij.ojp.gov/topics/articles/five-things-about-deterrence.

Here, the certainty of several months of hard prison time is reasonably sufficient to deter future conduct of this type and promote respect for the law.  False statements on any government documents, not to mention immigration and political campaign contribution disclosures, require

diligent truth-telling to maintain the integrity of our immigration and political processes. Understanding that one's liberty can be taken away for seven months for such false reporting provides real deterrence. There is no need for additional prison time to accomplish this federal sentencing goal. The marginal impact of three to five additional months of custody would be tremendous for Mr. Qin, but research indicates that the severity of prison terms does not add any value to general deterrence. *Id.*

Moreover, in this case, Mr. Qin's conduct is non-violent and he has no prior convictions.[6] While the repeated conduct, pled in three counts, suggest the need for imprisonment, seven months is "sufficient, but not greater than necessary," to satisfy both aspects of the parsimony clause. 18 U.S.C. § 3553(a).  *See also, United States v. Ilayayev*, 800 F. Supp. 2d 417, 451 (E.D.N.Y. 2011) (finding that although advisory Guidelines range was 57 to 71 months, with a sentence of five years' probation "[g]eneral deterrence is accomplished. The sentence will send a clear message" that criminal activity "will result, at the very least, in a substantial restriction of freedom."); *United States v. Schulman*, No. 16 Cr. 442 (JMA), ECF Doc. 155 (E.D.N.Y. Oct. 6, 2017) (reputational ruin and end of the defendant's professional career was "substantial and meaningful punishment," and where the defendant's "emotional well-being has suffered as a result"); *United States v. Speed Joyeros, S.A.*, 204 F. Supp. 2d 412, 440 (E.D.N.Y. 2002) ("The court may depart downward where defendant's business has been destroyed, preventing re-entry into criminal life").

---

[6] The Sentencing Reform Act explicitly instructed the Commission "to insure that the guidelines reflect the general appropriateness of imposing a sentence *other than imprisonment* in cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense." 28 U.S.C. § 994(j) (emphasis added).  However, the Commission failed to do so. Rather, the Commission "redefined 'serious offense' in a way that was entirely inconsistent with prior practice," and "led to a far higher incarceration rate for non-violent first offenders than had been the pattern pre-Guidelines." *United States v. Watt*, 707 F.Supp.2d 149, 158 (D. Mass. 2010).

**B.**     **Detention at MDC Brooklyn Provided a Particularly Severe Seven-Month Period of Incarceration to Specifically Deter Mr. Qin in the Future**

Specific deterrence was more than amply achieved on Mr. Qin during his seven months of harsh conditions at the MDC Brooklyn.  As a first-time, non-violent offender, Mr. Qin faced prolonged confinement in a facility that does not separate offenders by security classification.  The MDC Brooklyn is also notorious for prolonged lockdowns, inmate violence, lack of medical attention and unsanitary conditions.  These seven months of incarceration have caused Mr. Qin to feel heightened anxiety and outright fear over his living conditions.

Mr. Qin has been housed at the MDC Brooklyn since October 2, 2023.  Judge Colleen McMahon described the MDC Brooklyn as "disgusting" and "inhuman." *United States v. Days*, No. 19-cr-619 (CM) (S.D.N.Y. Apr. 29, 2021) (ECF Doc. 35), Sent. Tr. at 19-21.  Magistrate Judge Cheryl L. Pollak described it as a "third-world country prison." John Marzulli, *Judge Refuses to Send Women to Brooklyn Jail with 'Third World Conditions,* N.Y. Daily News (Oct. 7. 2016), https://www.nydailynews.com/2016/10/07/exclusive-judge-refuses-to-send-women-to-brooklyn-jail-with-third-world-conditions/.

As recently as January 4, 2024, Judge Furman held that "the conditions at the MDC constitute 'exceptional reasons' why detention of most defendants who do not pose a risk of flight or danger to the community . . . 'would not be appropriate.'" *United States v. Chavez,* No. 22-cr-303 (JMF), 2024 WL 50233, at *8 (citation omitted).  In making this astonishing determination, Judge Furman noted the parade of horribles confronting MDC detainees:

> In the winter of 2019, a power outage left inmates without light or heat for a full week while a polar vortex swept the East Coast.  Since that time, the dockets of this Court and the Eastern District have been filled with cases in which defendants complain about near-perpetual lockdowns (no longer explained by Covid-19), dreadful conditions, and lengthy delays in getting medical care.  Contraband – from drugs to cell phones – is widespread.  At least four inmates have died by suicide in the last three years.  It has gotten to the point

16

> that it is routine for judges in both this District and the Eastern
> District to give reduced sentences to defendants based on the
> conditions of confinement in the MDC.  Prosecutors no longer even
> put up a fight, let alone dispute that the state of affairs is
> unacceptable.

*Id.* at *1 (internal footnotes omitted).

These are the conditions that Mr. Qin has confronted over the last seven months.  For a man who was not charged with a crime of violence, nor had a criminal history, and faced minimal advisory Guidelines of under a year, these conditions are certainly severe.  Mr. Qin has told counsel of how he has experienced long periods of not being allowed out of his cell because of contraband found in the unit, or inmate fights in the facility.  Often, his only time out of the unit is when he works in the kitchen, which requires him to be out of his cell by 5:30 am each morning, five days per week. PSR, ¶ 61, at 12.  Somehow, this is worth it to him to avoid prolonged days of being locked in his tiny cell with no allowed movement at all.

████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████

████████████████████████████████████████

████████████████████████████████████████████



Finally, as if all of this is not enough, in the last few weeks, MDC inmates have reported that certain of the food served at the MDC Brooklyn were infested with maggots or other insects. *See* John Annese, *"Maggot-Infested Meals Being Served Inmates at Brooklyn Federal Jail, Lawyers Say,"* N.Y. Daily News (March 30, 2024), *available at* https://www.nydailynews.com/2024/03/30/Maggot-Infested-Meals  Being-Served-Inmates-at-Brooklyn-Federal-Jail-Lawyers-Say. Notbaly, Mr. Qin has lost considerable weight while housed at the MDC.

---

[7] Notably, when Judge Irizarry ordered, as a remedy for the MDC's "blatant disregard . . . of a very explicit order," that the defendant be transferred to a medical facility "forthwith, by no later than tomorrow," an MDC attorney responded that doing so would be an "impossibility" because "[o]ur staffing capabilities are currently – are extremely low." Dec. 15, 2023 Hrg. Tr. at 3, 15 *United States v. Young*, No. 23-cr-475 (DLI) (E.D.N.Y. Dec. 15, 2023). *See also* John Annese, *Brooklyn Judge Calls Sunset Park Federal Jail 'an Abomination' After Staff Ignore to Send Ailing Inmate to Medical Facility,* N.Y. Daily News (Dec. 20, 2023), available at https://www.nydailynews.com/2023/12/20/Brooklyn-Judge-Calls-Sunset-Park-Federal-Jail-an-Abomination-After-Staff-Ignore-to-Send-Ailing-Inmate-to-Medical-Facility.

Based on these disturbing conditions, and the seven months that Mr. Qin endured there, Mr. Qin has experienced significant punishment that will undoubtedly act to deter him for long into the future.  Mr. Qin is mentally, physically, and emotionally exhausted from his conditions of confinement.  He will need a significant period of transition to regain his health and to manage anxiety once released.

## IV.

## OFFENSE CONDUCT, THE PSR, AND THE SENTENCING GUIDELINES

As the Court is aware, Mr. Qin pled guilty to an Information under the terms of a written plea agreement.  Mr. Qin pled guilty to three false statement offenses.  These are Class C and E felonies.  First, he pled guilty to causing others to make political contributions in the name of another in violation of 52 U.S.C. §§ 30122 and 30109(d)(1)(D)(i).  He also pled guilty to causing another, *i.e.,* his wife at the time, of making a false statement on his petition for residency in the United States by intentionally omitting that he possessed a foreign identification card in another's name, in violation of 18 U.S.C. § 1546.  Finally, he pled guilty to causing the production of a false identification card, to wit, a Florida driver's license by telling the Florida Motor Vehicles Commission that he had a lawful address in Florida, in violation of 18 U.S.C. §1028(b)(2)(A).  The common nucleus of these three offenses is that each involved the making of a false statement to a government agency relating to the identity or aspects of the identity of the person completing the government disclosures.  It is this common "aggregate harm," which should cause this Court to conclude that the three offenses to which Mr. Qin pled guilty should group under the Guidelines as a single Group of "closely related counts." *See* U.S.S.G. § 3D1.2.

19

In this case, the Probation Office in Mr. Qin's PSR found that all three counts should be placed in separate groups for multiple-count analysis under the Guidelines. *See* PSR, ¶¶ 40, 42.  In Mr. Qin's plea agreement, the government contends that Mr. Qin's guilty plea to the Information should result in two groups under the Guidelines:  (1) the political campaign "straw donor" offense is one group; and (2) the false Florida license and false statement to Immigration authorities combine as a second group.  In the PSR, Mr. Qin's Guidelines score increases by three levels under the multiple count analysis, and under the government's estimate in the  plea agreement, Mr. Qin's score increases by two levels.

We note, however, that the government agrees in the plea agreement:  "Irrespective of the above-described Multiple Count Adjustment, . . . to not advocate for more than an advisory Sentencing Guidelines range of 0-6 months' imprisonment." (Court Ex. 1, at 4-5.)

Thus, under both the Government's and Probation Office's recommendations, the request to the Court is to impose a time-served sentence.  In this recommendation, the parties are unanimous.

However, for the sake of academic accuracy, we note that a reasonable application of the advisory Guidelines should result in a Total Offense Level of 8, which at CHC I, results in a range of 0-6 months, after a two-level reduction for acceptance of responsibility and two-levels for the "zero-point" offender reduction under U.S.S.G. § 4C1.1(a).

Specifically, U.S.S.G. § 3D1.2(d) instructs the sentencing Court to group "[a]ll counts involving substantially the same harm," when "the offense level is determined largely on the basis of . . . some other measure of aggregate harm."  In this case, the "other

20

measure of aggregate harm" contemplated by these three offenses is obstructing a lawful function of the Government by deceitful or dishonest means.  Each of these three offenses has this common harm.

The fact that each of the offenses apply different Guidelines sections under Chapter 2 does not defeat the applicability of U.S.S.G. § 3D1.2(d).  Indeed, application note 6 to § 3D1.2 addresses this issue specifically:  "[c]ounts involving offenses to which different offense guidelines apply are grouped together under subsection (d) if the offenses are of the same general type and otherwise meet the criteria for grouping under this subsection. In such cases, the offense guideline that results in the highest offense level is used." U.S.S.G. § 3D1.2, cmt. n. 6.

While the Second Circuit has rejected an automatic aggregation of all counts in which the offenses are listed in the "to be grouped" chart in § 3D1.2(d), *see United States v. Napoli*, 179 F.3d 1 (2d Cir. 1999), the Second Circuit has not agreed upon a specific test to apply to determine grouping under this subsection.  Indeed, in *United States v. Lenoci*, 377 F.3d 246, 256 (2d Cir. 2004), the Court concluded that "[t]he case at bar does not present a proper occasion to resolve these issues."  Thus, the interpretation of what constitutes "aggregate harm" measures under § 3D1.2 remains an open question in the Circuit.

However, guidance in *Napoli* and *Lenoci* instructs this Court that the determination of a common "aggregate harm" among counts cannot rest on "automatic" conclusions. *Id.* at 253-54. Neither the existence of multiple victims, nor the applicability of different Chapter 2 sections disqualifies different offenses from being grouped because of some common "other measure of aggregate harm." U.S.S.G. § 3D1.2(d).  For example, in *Napoli,*

21

the Second Circuit explicitly disapproved the same-victim requirement in order to group counts under § 3D1.2(d). *Napoli*, 179 F.3d at 8-9.

Later, in *Lenoci* the Second Circuit also was not persuaded by the government's argument that "difficulties in aggregation" among different Chapter 2 Guidelines sections should automatically disqualify the offenses from being grouped under § 3D1.2(d).  *Lenoci,* 377 F.3d at 255.  In *Lenoci*, the Court frowned upon a formalistic rule that required all of the counts to fall under the same Chapter 2 Guideline "to be grouped" under the "other measure of aggregate harm" provision in § 3D1.2(d).  *Id.*  The *Lenoci* court instead focused on the Commission's *purpose* in creating the grouping provisions in the Guidelines in the first place.  The Court notably explained:

> Furthermore, one of the purposes of the grouping provisions is to reduce the importance of the charging decision. *See* U.S.S.G., ch. 3 pt. D, intro. cmt. ¶ 4 (stating that the grouping rules serve "to limit the significance of the formal charging decision and to prevent multiple punishment for substantially identical offense conduct").

*Id.* (citing *United States v. Ahmad*, 202 F.3d 588, 591 (2d Cir. 2000)).

In this case, Mr. Qin pled guilty pursuant to an Information drafted by the government.  The prosecutors decided to proceed on three similarly focused charges against Mr. Qin.  All three involved false statements involving identity, and all three focused its "aggregate harm" on obstructing government actors from carrying out their lawful function.  As the Court reasoned in *Lenoci*, Mr. Qin's punishment should not be enhanced based on a charging decision when all three counts involve substantially identical conduct – aimed at the same harm.

Section 3D1.2 dictates that "[a]ll counts involving substantially the same harm shall be grouped together into a single Group."  Based on the principles specified in U.S.S.G. §

3D1.2(d) and application note 6, as explained above, Mr Qin's three offenses should combine as a single closely related group and not create additional offense level increases based on multiple unrelated counts.

## V.

## CONCLUSION

For the reasons stated above, Defendant Hui Qin respectfully requests that the Court impose a sentence of time-served, which is sufficient but not greater than necessary to achieve the goals of federal sentencing.

Dated: April 16, 2024        Respectfully submitted,
      New York, New York

MEISTER SEELIG & FEIN PLLC

By:          /s/

Henry E. Mazurek
hem@msf-law.com

*Counsel for Defendant Hui Qin*